IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HASSAN HAYES, | ) | CASE NO.  1:19-cv-02830 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Hassan Hayes ("Plaintiff" or "Hayes") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On June 24, 2016, Hayes filed an application for supplemental security income ("SSI"). Tr. 12, 69, 196.  Hayes initially alleged disability beginning on February 1, 2001, but later, at the April 25, 2018, hearing, through his attorney, amended his alleged disability onset date to June 24, 2016.  Tr. 12, 5-52, 218.  Hayes alleged disability due to bad migraines and headaches; difficulty speaking due to stuttering problems; numbness in arms and legs; knees hurt and pop out; shoulder pain; organic brain disorder; and depression.  Tr. 69, 97, 110, 231.

After initial denial by the state agency (Tr. 97-103) and denial upon reconsideration (Tr. 110-114), Hayes requested a hearing (Tr. 115).  On April 25, 2018, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 48-67. After Hayes' representative was provided the ability to obtain additional medical records, (Tr. 31), a supplemental hearing was held on September 19, 2018, (Tr. 29-47).

On December 27, 2018, the ALJ issued an unfavorable decision, (Tr. 9-28), finding that Hayes had not been under a disability within the meaning of the Social Security Act since June 24, 2016, the date the application was filed (Tr. 13, 23).  Hayes requested review of the ALJ's decision by the Appeals Council.  Tr. 185-187.  On November 6, 2019, the Appeals Council denied Hayes' request for review, making the ALJ's December 27, 2018, decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.     Personal, vocational and educational evidence

Hayes was born in 1972.  Tr. 22, 196.  Hayes completed school through the 11th grade and has no past relevant work experience.  Tr. 22, 43, 59, 60-61.  Hayes was homeless at various times and his parents had taken care of him.  Tr. 57-60.  Hayes was incarcerated in 2004 for six months to a year.  Tr. 57-58.  Hayes was also incarcerated for a short time in 2013.  Tr. 60. Hayes reported his incarceration to social security and his benefits ceased in 2013.  Tr. 32, 58. When he was released and sought to have his benefits reinstated, social security found that he was no longer disabled.  Tr. 32, 58.

### B.     Medical evidence

#### 1.  Treatment history

When Hayes was three years old, he suffered an injury to the head that required a craniotomy.  Tr. 309, 328-329, 392, 417.  He has two plates in his head.  Tr. 328. Hayes has a history of knee pain, depression, headaches, stuttering, and seizure disorder.  Tr. 309, 317, 328-329, 342, 370, 392-397, 415.

In August 2017, Hayes saw Dr. Sean Downes, M.D., at MetroHealth in the family medicine department to establish a primary care treatment relationship.  Tr. 321.  Hayes complained of dizziness and headaches.  Tr. 321.  Hayes relayed a history of TBI (traumatic brain injury) as a child and reported that he had headaches on and off.  Tr. 321.  Hayes also reported being depressed with no suicidal ideation and having numbness in his fingers.  Tr. 321. Dr. Downes recommended further evaluation by PM&R for the numbness in Hayes' fingers and a neurological evaluation for his TBI.  Tr. 323-324.  Dr. Downes noted that Hayes' TBI was stable.  Tr. 323.

Upon Dr. Downes' referral, on September 19, 2017, Hayes saw Dr. Michael A. Harris, M.D., in the PM&R department at MetroHealth for an evaluation.  Tr. 328.  Hayes complained of neck, arm and hand pain and numbness and tingling in his fingers.  Tr. 328.  He also reported a long history of migraine headaches.  Tr. 328.  Hayes relayed that he had been having the symptoms for years but his symptoms had been getting progressively worse.  Tr. 328.  Dr. Harris noted that Hayes had recently been prescribed Motrin for his pain but he had not filled the prescription.  Tr. 329.  Hayes rated his pain about a 5-6 out of 10 with it being worse than that at times.  Tr. 329.  Hayes was most concerned about the tingling.  Tr. 329.  On physical examination, Dr. Harris observed some tenderness to the C4-5 and C5-6 interspaces as well as in the paraspinals but "no spasm or trigger point Spurling."  Tr. 329.  Spurling's maneuver testing increased the pain in Hayes' neck but did not cause radicular symptoms.  Tr. 329.  A bilateral

3

shoulder examination revealed normal sensation to light touch.  Tr. 329.  Hayes had normal range of motion in his fingers.  Tr. 330.  Dr. Harris noted that a neurological examination revealed normal sensation, strength, and reflexes in the upper extremities but he could not elicit lower extremity reflexes.  Tr. 330.  Provocative tests for carpal tunnel were negative.  Tr. 330. Dr. Harris recommended an x-ray of the cervical spine and an EMG.  Tr. 330. Dr. Harris provided Hayes with a prescription for Motrin and noted that they would consider adding low-dose gabapentin.  Tr. 330.  Dr. Harris also recommended that Hayes start physical therapy for cervical stabilization and strengthening.  Tr. 330.

Upon Dr. Harris' referral, on October 10, 2017, Hayes attended a physical therapy evaluation with Matthew Lieb, PT, regarding his neck pain and bilateral upper extremity tingling.  Tr. 341.  Mr. Lieb reviewed a September 19, 2017, cervical spine x-ray, noting it showed a slight narrowing of the C4-5 disc space; no significant foraminal encroachment of the right foramina; no acute fracture; and no abnormal subluxation.  Tr. 341. Following his examination, Mr. Lieb noted the following problems: pain, decreased range of motion, decreased flexibility and postural deviation.  Tr. 344.  Mr. Lieb indicated that Hayes' prognosis for therapy was fair.  Tr. 344.  Hayes continued with physical therapy with improvement.  Tr. 348-350, 365.

Hayes had an MRI of his head on October 17, 2017.  Tr. 358.  It showed no intracranial findings but showed posttraumatic changes with encephalomalacia in bifrontal and right temporal lobe, as well as old hemorrhage in the craniotomy site.  Tr. 358, 395.

Hayes saw Dr. Harris on November 21, 2017, regarding his back symptoms/complaints. Tr. 365.  Hayes' main issue had been neck pain and tingling in his arm.  Tr. 365.  Hayes reported that physical therapy was helping.  Tr. 365.  Dr. Harris noted that Hayes attended seven physical therapy sessions with "dramatic improvement."  Tr. 365.  Hayes was having little or no pain and

normal range of motion.  Tr. 365.  He occasionally had some aching but it was much better; he was using Motrin very sparingly; and was a "happy camper."  Tr. 365.  Dr. Harris' impression was history of TBI without loss of neuro function as well as spondylogenic neck pain secondary to DDD with marked improvement.  Tr. 366-367.  Dr. Harris recommended that Hayes continue with his exercise program, continue with Motrin as needed, and follow up with Dr. Harris as needed.  Tr. 367.

Upon Dr. Harris' referral, an EMG was performed on January 18, 2018.  Tr. 335-336. The EMG was unable to confirm or exclude right C5 or C6 radiculopathy.  Tr. 336.  There was no evidence of entrapment mononeuropathy or polyneuropathy.  Tr. 336.

On February 12, 2018, upon Dr. Downes' referral, Hayes started physical therapy for chronic pain in his knees.  Tr. 370.  He saw physical therapist Paula Divincenzo.  Tr. 370.  Hayes relayed that his pain was increased by climbing up stairs, prolonged walking, prolonged standing and sitting too long, and cold.  Tr. 371, 373.  His pain was decreased with medication and rest. Tr. 371.  Hayes' bilateral knee pain and weakness was greater on the right than left.  Tr. 373. Ms. Divincenzo noted that Hayes' problems included pain, decreased strength, decreased flexibility, decreased function and lack of home exercise program.  Tr. 373.  Hayes continued with physical therapy for his knees.  Tr. 377-379, 398-405.  During physical therapy sessions, Hayes' therapist noted that Hayes required increased cues to recall his home exercise program due to cognitive/memory issues.  Tr. 379, 400, 404.

On April 12, 2018, Hayes saw Rikki Johnson, APRN-CNP, in the neurology department at MetroHealth regarding his headaches.  Tr. 392-396.  Hayes relayed a history of headaches 4-5 days per week (frontal and sometimes posterior); feeling like he gets punched; seeing spots; blurred vision; lightheadedness; photophobia at times; nausea at times; loss of balance at times;

arms jerking at times and feeling like he loses control; and memory problems.  Tr. 392.  He reported no history of convulsions, no episodes of confusion or wandering; and no instances where he finds himself with incontinence or a bloody mouth.  Tr. 392.  Hayes relayed that since starting Depakote his headaches had improved greatly in terms of intensity but he was still having headaches five days per week.  Tr. 393.  At times, Hayes' anxiety and sleep were worse.  Tr. 393.  Hayes had an EEG due to concerns regarding his facial twitching, intermittent arm jerking, and positive epileptic focus.  Tr. 393.  The EEG performed in 2018 was suggestive of a structural lesion in both frontal regions and isolated sharp transients were also seen in both frontal regions, greater on the right than the left, and consistent with active epileptogenic focus.  Tr. 396.  Hayes relayed that he was working to establish SSI benefits again.  Tr. 393.  On examination, Nurse Johnson observed intermittent twitches of the right lower face and sometimes over the bilateral outer mouth and spasticity with his voice at times.  Tr. 394.  Nurse Johnson did not observe twitching of the extremities.  Tr. 394.  Hayes' motor strength was 5/5; there were no tremors and his tone and bulk were okay.  Tr. 394.  Hayes' sensation was normal to light touch, temperature, and pinprick.  Tr. 394.  Hayes' coordination was intact; his posture was normal; and his gait was steady.  Tr. 394.  Nurse Johnson's impressions included that Hayes had residual memory deficits due to his remote history of TBI with chronic daily headaches.  Tr. 396.  Nurse Johnson increased Hayes' dosage of Depakote due to the EEG findings and Hayes' continued headaches; she started him on medication for his poor sleep and stated depression and anxiety; referred him to psychiatry and noted "seizure precautions" but did not identify them.  Tr. 396.

Hayes saw Eliot Gutow, LISW, at MetroHealth on June 7, 2018, for behavioral health counseling and therapy.  Tr. 417.  Hayes complained of poor concentration.  Tr. 417-418.  On

mental status examination, Hayes was cooperative; his speech was spontaneous with a normal

rate and flow; his thought process was logical and organized; his recent memory was poor; his

mood was dysphoric, his affect constricted, and his judgment and insight were fair.  Tr. 418.

Hayes' mental health diagnosis was moderate episode of recurrent major depressive disorder.

Tr. 419.  Mr. Gutow's clinical impression was that Hayes' symptoms were in partial remission.

Tr. 418.

During his June 29, 2018, session with Mr. Gutow, Hayes relayed that he was concerned

about not being able to work due to seizures he had had on the job.  Tr. 413.  He explained he

had been working at a fast food restaurant and had a seizure and was fired.  Tr. 413.  Hayes was

concerned about what he would do if his mother died – she was battling cancer.  Tr. 413.  Hayes

also reported he was worried about "no disability."  Tr. 413.  Hayes had undergone some

cognitive testing that showed Hayes to be in the normal range of cognitive functioning.  Tr. 413.

Hayes' mental health diagnosis remained as moderate episode of recurrent major depressive

disorder and Mr. Gutow's clinical impression continued to be that Hayes' symptoms were in

partial remission.  Tr. 413-414.

### 2.  Opinion evidence

### *Treating providers*

In July 2018, Nurse Johnson completed a Medical Source Statement: Patient's Physical

Capacity.  Tr. 422-423.  Nurse Johnson opined that Hayes would be limited to lifting/carry 5-10

pounds occasionally due to "balance instability [and] severe movements of arms." Tr. 422.  She

opined that Hayes would be limited to standing/walking for a total of 2 hours, indicating that

Hayes' walking could be impaired at times due to balance problems.  Tr. 422.  Nurse Johnson

found no impairment in Hayes' ability to sit.  Tr. 422.  She opined that Hayes could rarely climb,

balance, or crawl and he could occasionally stoop, crouch or kneel. Tr. 422. Noting Hayes'
TBI, Nurse Johnson opined that Hayes could rarely perform fine manipulation and could
occasionally reach, push/pull, and perform gross manipulation. Tr. 423. Nurse Johnson opined
that Hayes could not be exposed to moving machinery or noise due to his seizure disorder. Tr.
423. Nurse Johnson indicated that Hayes suffered from chronic headaches and the pain was
moderate. Tr. 423. She also opined that Hayes' pain would interfere with his concentration,
cause him to be off task, and cause absenteeism. Tr. 423. Nurse Johnson opined that, on
average, Hayes would require additional unscheduled rest periods for 30 minutes to 1 hour per
day. Tr. 423. Nurse Johnson listed Hayes' TBI, impaired concentration, balance problems,
seizures, and chronic headaches as additional limitations that would interfere with work 8 hours
per day/5 days per week. Tr. 423.

### *Consultative examiners*

On November 1, 2016, Hayes underwent a consultative physical evaluation conducted by
Dr. Martin Fitzgerald, M.D. Tr. 303-310. Dr. Fitzgerald diagnosed chronic headaches. Tr. 309.
Dr. Fitzgerald noted that Hayes had long-standing headaches. Tr. 309. However, Hayes'
neurological evaluation was completely normal; Hayes' gait was normal; and his range of
motion studies were good. Tr. 309. Dr. Fitzgerald opined that:

> Based on the findings of [his] examination, the patient does appear capable of
> performing a moderate amount of sitting, ambulating, standing, bending, pushing,
> pulling, lifting and carrying heavy objects. He had no difficulty reaching, grasping
> or handling objects. There were no visual limitations. This assessment does not
> reflect on any disability secondary to the patient's underlying mental status.

Tr. 310.

On November 3, 2016, Hayes underwent a consultative psychological evaluation conducted by Richard E. Sexton, Ph.D.[1]  Tr. 313-320.  Dr. Sexton observed a noticeable stutter. Tr. 316.  However, Hayes was able to make himself understood.  Tr. 316.  Dr. Sexton diagnosed depressive disorder not otherwise specified; personality disorder not otherwise specified (depressive; dependent; and anti-social traits); and psychosocial stressors (emotional problems; unemployed; no income; limited peer support network; limited social/recreation activity involvement; and speech problems).  Tr. 317.  Dr. Sexton stated the following regarding his opinion as to Hayes' prognosis:

> The claimant's reported history suggests the presence of depression over the past several years.  Symptoms have waxed and waned over the course of the interim period. Despite the report of a recent increase in depression, the claimant is maintained in the community and has never required a high level of mental health care.  Neither significant resolution of symptoms nor significant deterioration in mental functioning is expected.

Tr. 318.

### *State agency reviewing consultants*

### *Psychological*

On initial consideration of Hayes' disability claim, on November 22, 2016, state agency reviewing psychologist Cynthia Waggoner, Psy.D., completed a psychiatric review technique ("PRT") (Tr. 74-75) and a mental RFC assessment (Tr. 76-78).  In the PRT, Dr. Waggoner opined that Hayes had no difficulties in maintaining social functioning; mild restriction in activities of daily living; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. Tr. 75.

---

[1] Dr. Sexton also conducted a consultative evaluation in 2007 as part of an earlier disability application.  Tr. 276-282.

In the mental RFC assessment, with respect to Hayes' understanding and memory limitations, Dr. Waggoner opined that Hayes was moderately limited in his ability to understand and remember detailed instructions, explaining that it was estimated that Hayes was functioning in the low average range and able to understand and remember one- to -three step tasks.  Tr. 77. With respect to Hayes' sustained concentration and persistence limitations, Dr. Waggoner opined that Hayes was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 77.  Dr. Waggoner explained that Hayes would have the ability to perform simple, routine tasks in a low pressure environment with no high production demands.  Tr. 77-78.  Dr. Waggoner opined that Hayes had no social interaction limitations.  Tr. 78.  With respect to Hayes' adaptation limitations, Dr. Waggoner opined that Hayes was moderately limited in his ability to respond appropriately to changes in the work setting.  Tr. 78.  Dr. Waggoner explained that Hayes would have the ability to adjust to occasional changes in the workplace as long as changes were explained in advance.  Tr. 78.

Upon reconsideration, on March 2, 2017, state agency reviewing psychologist Kristen Haskins, Psy.D., completed a psychiatric review technique ("PRT") (Tr. 87-88) and a mental RFC assessment (Tr. 90-92).  In the PRT, Dr. Haskins found that Hayes had mild limitations in understanding, remembering or applying information and in interacting with others; and moderate limitations in ability to concentrate, persist, or maintain pace and adapt or manage oneself.  Tr. 88.

In the mental RFC assessment, with respect to Hayes' understanding and memory limitations, Dr. Haskins opined that Hayes was not significantly limited in his ability to

understand and remember detailed instructions, noting that Hayes was estimated to be functioning in the low average range.  Tr. 90.  With respect to Hayes' sustained concentration and persistence limitations, Dr. Haskins opined that Hayes was moderately limited in his ability to maintain attention and concentration for extended periods and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 90-91.  Dr. Haskins opined that Hayes would have the ability to complete short cycle tasks in a setting with no demand for fast pace.  Tr. 91.  With respect to Hayes' social interaction limitations, Dr. Haskins opined that Hayes was not significantly limited in his ability to accept instructions and respond appropriately to criticism from supervisors or in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 91.  With respect to Hayes' adaptation limitations, Dr. Haskins opined that Hayes was moderately limited in his ability to respond appropriately to changes in the work setting.  Tr. 91.  Dr. Haskins explained that Hayes would have the ability to adjust to occasional changes in the work place as long as changes were explained in advance and that his ability to handle stress and pressure in the workplace would be reduced but he would have adequate ability to handle tasks without strict time limitations or production standards.  Tr. 91-92.

*Physical*

On initial consideration, on November 21, 2016, state agency reviewing physician Dr. Esberdado Villanueva, M.D., opined that Hayes did not have a severe physical impairment.  Tr. 74.  Upon reconsideration, on March 3, 2017, state agency reviewing physician Dr. Sreenivas Venkatachala, M.D., also opined that Hayes did not have a severe physical impairment.  Tr. 87.

**C.    Testimonial evidence**

### 1.      Plaintiff's testimony

Hayes testified and was represented by counsel at both the April 25, 2018, and September 19, 2018, hearings.  Tr. 57-66, 35-39, 43.

*April 25, 2018, hearing testimony*

Hayes testified that, when he was three-years old, he suffered a brain injury.  Tr. 61.  He underwent a craniotomy.  Tr. 65.  Other than what Hayes has been told about the incident, he has no recollection of it.  Tr. 61.  When Hayes was asked what symptoms he felt prevented him from being able to sustain work and what symptoms he was being treated for, Hayes explained that he has headaches; he gets dizzy and has blurred vision after standing for long periods of time; he was in physical therapy for his knees due to having been hit by a motor vehicle; memory loss; stuttering; and numbness in his fingertips.  Tr. 61-62.

Hayes indicated that his symptoms have gotten worse over the years and, beginning around 2010, he started to have brain seizures.  Tr. 62, 65-66.  Hayes explained that, when he is having one of his seizure episodes, his face twitches and he starts stuttering.  Tr. 62-63.  At times, others cannot understand what Hayes is saying.  Tr. 63.  Hayes does not lose consciousness when he has a seizure.  Tr. 63.  Hayes relayed that he recently had an EEG and he was on medication for his seizures.  Tr. 62.  Hayes believes that his medication helps with his seizures.  Tr. 63.  He also takes medication for his headaches.  Tr. 63, 66.  When asked about side effects from his medications, Hayes explained that his medication has caused his face to break out.  Tr. 66.

Hayes experiences mood swings and has really bad anxiety attacks.  Tr. 63.  He was going to undergo a psychological evaluation.  Tr. 63.  He had recently moved back to the Cleveland area and felt that doing so had been very helpful because he had been able to get

12

medical treatment for his conditions.  Tr. 64-65.  For example, the intensity of his headaches had

lessened.  Tr. 65.  Hayes gets headaches four to five times each week.  Tr. 65.  They wake him

up while he his sleeping.  Tr. 65.

*September 19, 2018, hearing testimony*

Hayes reiterated that symptoms he was experiencing included memory loss and a stutter.

Tr. 35.  He also explained that he did not know he was having brain seizures but his neurologist

ordered an EEG and it showed he was having them.  Tr. 35.  He explained, when he has a

seizure, he has a massive headache.  Tr. 35.  Following an episode, it takes Hayes about one to

two hours to feel back to normal with medication.  Tr. 35.  Hayes feels that his medication is

helpful in treating his symptoms.  Tr. 36.  One medication side effect is drowsiness.  Tr. 36.

Hayes naps during the day for about two to four hours due to an increase in the dosage of his

medication.  Tr. 36.  Hayes indicated that the increase in the dosage of his medication has helped

with the face twitching and memory.  Tr. 37.

Hayes experiences depression and anxiety and he is very moody.  Tr. 38.  Hayes had

started psychological treatment with a counselor at Metro.  Tr. 37.  He was seeing his counselor

every two to three weeks but had not yet been prescribed medication.  Tr. 37.  Hayes felt that his

mental health symptoms had improved since seeing his counselor.  Tr. 38.  When Hayes is

depressed, he gets nervous and his stutter gets worse.  Tr. 39.  When Hayes feels calm, he does

not stutter as much.  Tr. 39.

2.      **Vocational Expert**

A Vocational Expert ("VE") testified at the second hearing.  Tr. 43-46.  For her first

hypothetical, the ALJ asked the VE to consider an individual with an 11th grade education, no

work history, and who was 46 years old who has no exertional limitations but should never climb

13

ladder, ropes, or scaffolds; has to avoid standing water; cannot perform commercial driving; cannot operate dangerous moving equipment or be around it; is limited to simple, routine, repetitive work without production rates for time or quantity; and is limited to speaking, signaling, serving, and asking questions.  Tr. 43-44.  The VE identified three jobs that the hypothetical individual could perform, including industrial cleaner, merchandise marker, and sales attendant.  Tr. 44-45.

For her second hypothetical, the ALJ asked the VE to consider the first hypothetical with the addition of the individual being off task 10% of the day due to psychologically or physically based symptoms.  Tr. 45.  The VE indicated that the individual "would be at the very edge of the threshold where employers start eliminating workers for lost production."  Tr. 45.  The VE further explained that some employers terminate employment for individuals who are off task 10% of the time and most employers terminate employment for individuals who are off task 15% of the time.  Tr. 45.  In response to Hayes' counsel's question regarding the threshold for absenteeism, the VE indicated that an individual "who is absent a day or more averaged over a 12-month period will be unable to sustain employment based on that pattern over time."  Tr. 46.  The VE clarified that it would include "things like late arrivals, early departures."  Tr. 46.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[3] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[3] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her December 27, 2018, decision, the ALJ made the following findings:[4]

1.   Hayes has not engaged in substantial gainful activity since June 24, 2016, the application date.  Tr. 15.

2.   Hayes has the following severe impairments: major depressive disorder (in partial remission), seizure disorder and remote history of traumatic brain injury (when he was a three-year-old).  Tr. 15.

3.   Hayes does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 15-16.

4.   Hayes has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: can never climb ladders, ropes or scaffolds; should avoid standing water; cannot perform commercial driving or operate dangerous moving equipment such as power saws and jackhammers or being around them; limited to simple, routine, repetitive work without production demands for time or quantity; and limited to speaking, signaling, serving and asking questions.  Tr. 16-22.

5.   Hayes has no past relevant work.  Tr. 22.

6.   Hayes was born in 1972 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 22.

7.   Hayes has at least a high school education and is able to communicate in English.  Tr. 22.

8.   Transferability of job skills is not an issue because Hayes does not have past relevant work.  Tr. 22.

9.   Considering Hayes' age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Hayes can perform, including industrial cleaner, merchandise marker, and sales attendant.  Tr. 22-23.

---

[4] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Hayes had not been under a disability, as defined in the Social Security Act, since June 24, 2016, the date the application was filed.  Tr. 23.

## V. Plaintiff's Arguments

Hayes argues that the ALJ failed to properly evaluate his seizure disorder at Step Three of the sequential evaluation and erred in assessing Hayes' RFC without obtaining additional examining or non-examining physician review.  Doc. 15, pp. 9-11.  Hayes also argues that the ALJ improperly discounted the opinion rendered by his treating nurse provider, Rikki Johnson.  Doc. 15, pp. 11-14.

## VI. Law & Analysis

### A.  Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.**    **The ALJ did not err with respect to her consideration of Hayes' seizure disorder**

Hayes argues that the ALJ failed to properly evaluate his seizure disorder at Step Three and erred in assessing his RFC without obtaining additional examining or non-examining physician review.  Doc. 15, pp. 9-11.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).   A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. SSA*, 93 Fed. Appx. 725, 728 (6th Cir. 2004).  "If . . . the record 'raises a substantial question as to whether the claimant could qualify as disabled' under a listing, the ALJ should discuss that listing." *Sheeks v. Comm'r of Soc. Sec. Adm.*, 544 Fed. Appx. 639, 642 (6th Cir. Nov. 20, 2013) (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).

Hayes claims that the ALJ erred by not analyzing his seizure disorder under Listing 11.02 (Epilepsy).  Doc. 15, p. 9.  While the ALJ did not mention Listing 11.02 at Step Three, Hayes did not mention Listing 11.02 at the hearing.  Rather, at the hearing, Hayes mentioned Listing 12.11

18

but was focused on presenting a Step Five argument.  *See* Tr. 33-34.  Before this Court, Hayes argues that, "[g]iven the EEG evidence of a seizure disorder, the recognition of the seizure disorder by his treating provider, his prescription medication and reports of seizures, there is substantial evidence that Mr. Hayes' condition brings into question the need for analysis under Listing 11.02."  Doc. 15, p. 10.  Hayes has not shown that the ALJ did not consider that evidence and, in fact, the ALJ did find that Hayes' seizure disorder was a severe impairment.

Moreover, Hayes has not shown how the evidence upon which he relies raises a substantial question that his seizure disorder met or equaled Listing 11.02.  For example, Hayes fails to identify which of the various sections of Listing 11.02, i.e., 11.02(A), (B), (C), or (D) he meets. Even assuming arguendo that Hayes contends that he meets 11.02(B) or (D) which pertain to dyscognitive seizures,[5] he has not identified evidence showing that his seizures occur at least once a week for at least three consecutive months notwithstanding adherence to treatment (11.02(B)) or that they occur at least once every two weeks for at least three consecutive months notwithstanding adherence to prescribed treatment, with a marked limitation in one of the following areas: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintain pace; or adapting and managing oneself (11.02(D)).

Considering the foregoing, the Court finds that Hayes has not demonstrated that reversal and remand is required for further evaluation of his seizure disorder at Step Three.

---

[5] "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.00(H)(1)(b).

Hayes also contends that the ALJ erred in assessing Hayes' RFC because she was not qualified to interpret the EEG results; substituted her lay interpretation for that of qualified medical physicians; relied on outdated medical opinions; and should have called a medical expert or requested a further consultative examination. Doc. 15, pp. 10-11. Hayes contends that the state agency reviewing physicians did not have evidence regarding the seizure disorder before them and that the ALJ assigned "little weight" to Nurse Johnson's opinion, which was the only medical opinion in the record regarding Hayes' seizure disorder. Thus, he argues that the ALJ erred by not seeking further medical opinion evidence or examination and improperly interpreted raw medical data. *Id.*

An ALJ's use of a medical expert is discretionary. *See Davis v. Chater*, 1996 WL 732298, * 2 (6th Cir. 1996) (an ALJ is not required to call a medical expert). (citing 20 C.F.R §§ 404.1527(f)(2), 416.927(f)(2)). Further, where the record contains sufficient evidence for an ALJ to decide a disability claim absent expert medical testimony, a failure to solicit expert medical testimony will not serve as a basis to reverse an ALJ's decision. *See Williams v. Callahan*, 1998 WL 344073, *4 n. 3 (6th Cir. 1998) (finding that, because the record contained the claimant's extensive medical history, the ALJ did not err in not soliciting expert medical testimony). Furthermore, the regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence in your case record." 20 C.F.R. §§ 416.945(a)(3), 416.946(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 416.945(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. Aug. 18, 2009). And, when assessing a claimant's RFC, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* Here,

consistent with the regulations, the ALJ considered evidence regarding Hayes' seizure disorder and weighed the opinion evidence.  Tr. 17-22.

Hayes relies on *Lashley v. Sec. of Health and Human Servs.*, 708 F.2d 1048, 1051-1052 (6th Cir. 1983) for his contention that the ALJ did not satisfy her burden to develop the record. Doc. 15, p. 11.  However, the heightened duty that Hayes alludes to applies where a claimant is unrepresented at the administrative hearing.  *Lashley*, 708 F.2d at 1052.  And, even in instances where a claimant is not represented by counsel at the administrative hearing, reversal is not always required.  *Id.*  Here, as reflected in the record, Hayes was represented by counsel at both the first and supplemental hearing.  Tr. 31, 50.  His claim that the ALJ had an obligation to take additional steps to develop the record and seek additional opinion evidence or call for a medical expert is unfounded.

Moreover, although the state agency reviewing physician opinions were rendered prior to the development of the full record, including evidence relating to Hayes' seizure disorder, Hayes has not shown that the ALJ improperly relied on those opinions in assessing Hayes' RFC. "There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record."  *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011).  "The opinions need only be 'supported' by evidence in the case record."  *Id.*  Also, there must be "some indication that the ALJ at least considered" the later medical records.  *See Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007); *Blakely*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk*, 253 Fed. Appx. at 585).  Here, although the state agency opinions were rendered prior to the 2018 evidence relating to Hayes' seizure disorder, Hayes has not shown that the opinions are not supported by evidence in the record.  Further, while the state agency reviewers did not have the entirety of the case record

before them when they rendered their opinions, the ALJ considered the later developed records, including evidence relating to Hayes' seizure disorder.  *See e.g.*, Tr. 19 (citing Exhibit B6F (discussing Nurse Johnson's treatment notes and the EEG findings)).

For the reasons explained herein, the Court finds that Hayes has not demonstrated a basis upon which reversal and remand is warranted for further consideration of his seizure disorder at Step Three or with respect to Hayes' RFC assessment.

**C.    The ALJ did not err in her consideration of Nurse Johnson's opinion**

Hayes argues that the ALJ improperly discounted the opinion rendered by his treating nurse provider, Rikki Johnson.  Doc. 15, pp. 11-14.

For claims like Hayes' that are filed prior to March 27, 2017, the regulations define a "treating source" as a claimant's "own acceptable medical source" who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §416.927(a)(2).  Further, for claims filed prior to March 27, 2017, "acceptable medical source" includes licensed physician, licensed psychologist, licensed optometrist but does not include licensed advanced practice registered nurse or social worker.  20 C.F.R. § 416.902(a).  Since Nurse Johnson is not an "acceptable medical source," she is not a "treating source" subject to controlling weight analysis under the treating physician rule.  *See e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor was an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

Nevertheless, the opinion of a medical source who is not an "acceptable medical source" but who has seen a claimant in her professional capacity is relevant evidence.  SSR 06-03p, 2006

WL 2329939, * 6 (August 9, 2006).   And, SSR 06-03p provides guidance as to how opinions of

medical sources who are not "acceptable medical sources" are to be considered, stating,

> Since there is a requirement to consider all relevant evidence in an individual's case
> record, the case record should reflect the consideration of opinions from medical
> sources who are not 'acceptable medical sources' and . . . [a]ltough there is a
> distinction between what an adjudicator must consider and what the adjudicator
> must explain in the disability determination or decision, the adjudicator generally
> should explain the weight given to opinions from these 'other sources,' or otherwise
> ensure that the discussion of the evidence in the determination or decision allows a
> claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such
> opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.

Here, consistent with the regulations, while Nurse Johnson is not an "acceptable medical

source," the ALJ considered her opinion and explained the weight assigned to it, stating:

> Ricki Johnson, APRN, completed a Medical Source Statement:  Patient's Physical
> Capacity on July 26, 2018 (Exhibit B8F).  Because of balance instability and severe
> movements of arms, the claimant could occasionally lift and carry 5-10 pounds.  He
> could sit or stand or two hours in an eight-hour workday.  Walking can be impaired
> at times due to balance problems.  He could occasionally stoop, crouch or kneel.
> He could rarely climb, balance and crawl.  He could occasionally reach, push, pull,
> and perform gross manipulation.  He could rarely perform fine manipulation.
> Because of his seizure disorder, he should avoid moving machinery and noise.  He
> has chronic headaches and he experiences moderate pain that interferes with
> concentration, takes him off task, and causes absenteeism.  He would require
> unscheduled rest periods.  Because of his TBI, he has impaired concentration,
> balance problems and severe chronic headaches. The undersigned assigned little
> weight to this form because it is a pre-printed form and Ms. Johnson failed to
> provide sufficient support from treatment notes, diagnostic tests or clinical findings.
> Ms. Johnson used generic vague words and phrases.

Tr. 21.

Although Nurse Johnson is not an acceptable medical source, the ALJ clearly considered,

weighed and explained the reasons for assigning little weight to Nurse Johnson's opinion.  Hayes

argues that the ALJ's reasons for assigning little weight are insufficient because the ALJ only

had to look at Nurse Johnson's treatment records to find support for her opinions and should

have assigned controlling weight to Nurse Johnson's opinion.  Doc. 15, p. 13.  Hayes also takes

issue with the ALJ discounting the opinion because it was rendered on a pre-printed form and

because Nurse Johnson utilized generic words and phrases.  *Id.*  However, as discussed above,

Nurse Johnson, who is not an acceptable medical source, was not entitled to controlling weight.

Further, the ALJ did not ignore Hayes' diagnosis of seizure disorder, TBI, or other impairments

nor did she ignore Nurse Johnson's treatment notes or EEG findings when reviewing Hayes'

medical history.  *See e.g.*, Tr. 19 (citing Exhibit B6F).  It is not for this Court to weigh or

consider the evidence de novo.  The ALJ considered Nurse Johnson's opinion in light of the

record evidence and provided her reasons for finding it was only entitled to "little weight."  Tr.

21.  Moreover, the ALJ was not required to analyze Nurse Johnson's opinion under the "treating

physician" rule and "[t]he opinion of a 'non-acceptable medical source' is not entitled to any

particular weight or deference—the ALJ has discretion to assign it any weight he feels

appropriate based on the evidence of record."  *Noto v. Comm'r of Soc. Sec.*, 632 F. Appx. 243,

248–49 (6th Cir. 2015) (internal citations omitted).

Based on the foregoing, the Court finds that the ALJ did not err with respect to the

weighing of Nurse Johnson's opinion.  Nor has Hayes shown that the RFC assessment is

unsupported by the record.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: November 13, 2020

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge